No. 42,966

FRED E. J. HORNAMAN, RICHARD GRISWOLD, ROBERT L. KLEHR, RICH-
ARD M. ERICKSON, CHARLES W. HESS and RAY HODGE, *Appellees*,
v. CHARLES C. VAUGHAN, UNA O. VAUGHAN, R. J. BREIDENTHAL,
CYNTHIA VAUGHAN, JOHN WILLIAM MAHONEY, GUY STANLEY, JR.,
and DR. WILSON A. REITZ, and GENERAL SAVINGS AND LOAN AS-
SOCIATION, *Appellants*.

(379 P. 2d 257)

*David W. Carson,* of Kansas City, argued the cause, and *John K. Dear, Ernest N. Yarnevich, John William Mahoney, Joseph T. Carey,* and *John H. Fields,* all of Kansas City, were with him on the briefs for the appellants.

*John E. Blake,* of Kansas City, argued the cause, and *Bill E. Fabian, Robert E. Fabian,* and *John E. Blake, Jr.,* all of Kansas City, were with him on the briefs for the appellees.

The opinion of the court was delivered by

ROBB, J.: This is an appeal by defendants below from the trial court's judgment, findings of fact and conclusions of law, orders and decisions, and from all rulings of any type or nature, whether "mesne, intermediate or final," adverse to defendants, or any of them. Other questions raised in the notice of appeal will be discussed later herein where necessary.

The action was commenced by a group of purported stockholders and directors in their capacity as such against another purported group of stockholders and directors which latter group was in charge of and operating the General Savings and Loan Association, hereafter referred to as the association. Involved with the association is another separate and distinct corporation, General Insurance, Incorporated, but for the sake of expediency we shall refer only to the association.

On March 3, 1960, Lee J. Vaughan, the apparent organizer of the association, died leaving 145 shares of stock in the association to his widow, Una Vaughan. The total permanent stock of the association was 250 shares valued at $100 per share. The remaining 105 shares were owned by Blake A. Williamson, Joe F. Jenkins, J. E. Tobin, Joseph G. Evans, Grant Barcus, James K. and Margaret Cubbison, and Norman C. Christiansen. It is undisputed that at the time of organization the association had only five directors, that the number of directors was later increased to nine, and that was the number at the time this action was filed. The record clearly reveals that antagonistic feelings existed between the plaintiff group and the defendant group but we are not concerned therewith and will not discuss those matters herein.

Under date of October 4, 1961, the following agreement was entered into:

"THIS AGREEMENT between FRED HORNAMAN, party of the first part; and BLAKE A. WILLIAMSON, as trustee for himself, Joe F. Jenkins, James K. Cubbison, Norman C. Christiansen and Grant Barcus, parties of the second part.

"WHEREAS, parties of the second part, represented by Blake A. Williamson, as trustee, are the owners collectively of seventy-five (75) shares of the common stock of General Savings and Loan Association and also the owners collectively of seventy-five (75) shares of stock of the General Insurance, Inc.; and

"WHEREAS, the said party of the first part has indicated a desire to purchase the above described stocks and parties of the second part have expressed a desire to sell the same. The agreed price for both stocks is One Thousand Two Hundred Dollars ($1,200) per share, to be payable by purchaser to sellers in cash.

"Now, THEREFORE, party of the first part deposits with Blake A. Williamson, trustee, certified check in the amount of Ten Thousand Dollars ($10,000) and further agrees to pay the additional amount of Eighty Thousand Dollars ($80,000) within 20 days from this date in payment for such stock.

"It is further mutually agreed that the said Blake A. Williamson, trustee, shall obtain and have assigned in blank shares of stock in each of said above companies as follows:

| | |
|---|---|
| "Blake A. Williamson | 25 |
| "Joe F. Jenkins | 20 |
| "Norman C. Christiansen | 10 |
| "James K. Cubbison | 10 |
| "Grant Barcus | 10 |

"It is further mutually agreed that the said Blake A. Williamson, trustee, has obtained and has assigned in blank the following additional shares of stock in each of the above companies.

| | |
|---|---|
| "J. E. Tobin | 10 |

"It is agreed as to these shares that they will be sold on the terms herein provided except that because of a previous business transaction Hornaman shall pay for said ten shares the sum of Fourteen Thousand Eight Hundred and Seventy Dollars ($14,870.00).

"In addition to the acquisition of stock as described on the first page of this Agreement, Blake A. Williamson, as trustee, and Hornaman agree that Hornaman will attempt to acquire the twenty (20) shares of stock at One Thousand Two Hundred Dollars ($1,200.00) per share held by Dr. Joseph G. Evans. If Hornaman is unable to acquire said stock, Hornaman at his option may terminate this Agreement as to the stock accumulated by Williamson, as trustee, and may recover any amount so paid under this Agreement.

"It is understood by the parties that first party is desirous of acquiring the stock covered by this Agreement only in the event control of the Board of Directors can be maintained at least until the next annual meeting of General Savings and Loan Association; and because of circumstances known to both parties a general procedure as hereinafter described shall be followed, and Williamson, as trustee, agrees to cause said procedure to take place, to wit:

"There are presently eight (8) directors with three-year terms expiring in January of the years shown:

| | |
|---|---|
| "Blake Williamson | 1964 |
| "Joe Jenkins | 1964 |
| "Una Vaughan | 1964 |
| "Joseph G. Evans | 1963 |

"J. E. Tobin                                    1963
"R. J. Breidenthal                              1963
"Charlie Vaughn                                 1962
"Grant Barcus                                   1962

"Director Barcus has submitted his resignation; but it has not been acted upon and, therefore, the parties agree that they will attend and cause the following replacements to take place. (In addition to the above there is one vacancy in the Board created by the resignation of Director Christiansen whose term would have expired in January, 1964.) At the monthly Directors Meeting on October 5, 1961, Hornaman will be nominated to the vacancy created by Christiansen. Upon election Hornaman will qualify as director and enter the meeting. The question of Barcus' resignation will next be presented for approval and said resignation shall be accepted. Nomination will then be made of Richard M. Erickson for Barcus' position, and he shall be elected. Thereupon Erickson will qualify and enter the meeting. The resignation of Director Evans will next be tendered, accepted; and nominations and election to his office shall be made. Dick Griswold will be named to fill this office, and he shall qualify and enter the meeting. Director Tobin shall then submit his resignation. It shall be accepted, and nomination of Robert Klehr shall be made. He shall be elected to fulfill the Tobin term and shall immediately qualify and enter the meeting. The next order of business shall be the resignation and acceptance of Joe Jenkins, and Ray Hodge will be nominated and elected for the unexpired term of Jenkins. Upon his election Hodge will qualify and enter the meeting. Thereupon the resignation of Blake Williamson shall be tendered and accepted, and the nomination and election of Charles W. Hess will take place. He shall qualify and enter the meeting.

"If the above procedure is followed and said parties elected as above stipulated, then this Agreement shall thereafter be binding and in full force and effect. If any part of the procedure is not followed or if for any reason the above parties are not present in order that the above stipulated control of the Board may be maintained, this Agreement may be terminated at the option of first party; but said option shall be forthwith exercised.

"In Witness Whereof the parties have hereunto set their hands and seals this 4th day of October, 1961.

"s/ Fred Hornaman
"Party of the first part
s/ Blake A. Williamson
"Blake A. Williamson
"Trustee for Parties of the
second part"

An unnumbered exhibit, wherein the bylaws of the association were set out, was admitted into evidence. We hereinafter summarize the pertinent provisions thereof:

The corporation name and the object and purpose of the association was set out; the corporate existence was to be for a period of fifty years from October 21, 1921; all shareholders and borrowers from the association were members; the annual meeting was to be

held at the association's office at 4:00 p. m. on the first Thursday
after the first Monday in January of each year; the meeting could
be held at such other time or place in the same community as the
board of directors (hereafter generally referred to as the board)
might determine; each shareholder was entitled to cast one vote
for each $100 or fraction thereof of the withdrawal value of his
account; each permanent stockholder was entitled to one vote for
each share of stock held; each borrowing member was entitled to
only one vote; provision was made for voting by proxy.

Special meetings of members of the association could be called
with proper notice given; on or before thirty days before the date
of the annual meeting, the president, with approval of the board,
was to appoint a nominating committee of three members and
that committee, on or before twenty days before the annual meet-
ing, was to nominate a suitable member of the association to serve
as a director for each vacancy on the board whose term was to
expire at such annual meeting; such nominations were to be in
writing signed by the nominating committee and *filed with the
secretary;* all nominees' names were to be posted in a prominent
place in the home office for at least fifteen days prior to the date
of the annual meeting; if the nominating committee had not made
nominations prior thereto, nominations could be made from the
floor at the annual meeting; proposals with respect to new business
were to be presented at the annual meeting; the affairs of the asso-
ciation were to be managed and controlled by a board of five (now
nine) directors; at least a majority of the directors had to be elected
from the permanent members of the association with approximately
one third of the board being elected each year; the board was em-
powered to operate and manage the association in accordance
with the bylaws and the Savings and Loan Act of Kansas; any
vacancy occurring in the board or among the officers of the asso-
ciation could be filled by the board; *provision was made for regular
monthly meetings of the board* fixed by resolution of the board
without notice; the place of meeting could be changed by the
board; special meetings could be held and were to be called by
the secretary upon written request of the president, or of three
directors, upon at least three days' written notice to each director,
stating the place, time, and purpose thereof; a majority of the
directors (5) constituted a quorum and an act of a majority of
the board of directors present at any meeting, where there was
a quorum present, was an act of the board; a director could resign

at any time by sending written notice thereof to the office of the association addressed to the secretary and the resignation took effect upon receipt thereof by the secretary; directors could be removed by a two-thirds vote of all votes cast at an annual or special meeting; the board could appoint an executive committee composed of the president and two additional directors, which executive committee would have the power of the board between board meetings except as to amending the bylaws; each executive committee member was to continue in office until his successor was appointed; special meetings could be called by the president, or the other two members of the executive committee; the board was empowered to fill an executive committee vacancy; the secretary of the association was to serve as secretary of the executive committee and was to report to each regular meeting all actions taken by the executive committee; at the annual meeting of the board to be held within thirty days after the annual meeting of the members, the board was to elect a president, one or more vice-presidents, a secretary, and a treasurer provided that any two offices could be held by the same person; the chairman of the board *could be elected* from among the directors but the president *had to be* a director; all terms of the officers were for one year or until their respective successors were elected and qualified, and the officers had such powers and duties as were specified in the bylaws; the duties of the president, vice-president, secretary, assistant-secretary, treasurer, and assistant-treasurers were thereafter set out.

Provisions of the bylaws covering execution of instruments included one to the effect that with respect to securities owned by the association proxies to vote could be executed and delivered from time to time by the president, vice-president, secretary, or the treasurer; the manner in which membership certificates were to be issued to depositors or borrowers was outlined; a fee of $1.00 could be authorized by the board for transferring on the books the assignment of interest of any share accounts; the association had such power as was set forth in the Savings and Loan Act of 1943; included also were explanations of the relation of capital to shares paid for by members, how optional savings shares were to be issued, and how annual and semi-annual dividends were to be credited; "full paid shares" were issued upon the payment of $100; dividends could be declared at the close of business on June 30 and December 31 of each year; although dividends were provided for

they were not to be paid on permanent stock until all liabilities of the association were fully liquidated and paid.

We are not concerned here with the provisions of the bylaws regarding reserve stock shares or with respect to further provisions regarding the payment or restriction of dividends.

Members could request, and the association had to repurchase shares of depositors and the board could determine if any or all of the outstanding shares were to be redeemed on a dividend date in compliance with the Savings and Loan Act.

We are not particularly interested in and will not delineate other provisions relating to fines, fees, penalties, liens on shares or how amendments to the bylaws were to be made.

The trial court made findings of fact which are hereinafter summarized in pertinent part:

At the 1961 annual meeting of the association Charles Vaughan, Una Vaughan, Blake Williamson, Joe Jenkins, and Norman Christiansen were elected for three years terms; the other four members of the board at that time were Grant Barcus, Joe Tobin, and Dr. J. G. Evans, whose terms expired in 1963, and R. J. Breidenthal, whose term expired in 1962; the authorized permanent stock of the association was 250 shares; Una owned 145 shares, Blake Williamson 25 shares, Joseph Jenkins 20 shares, Norman Christiansen 10 shares, Grant Barcus 10 shares, Joe Tobin 10 shares, and Dr. Evans 20 shares; (the record shows that James and Margaret Cubbison owned the other ten shares but the trial court found only that the other shares were owned by individuals not directly involved in this appeal).

The trial court further found that on May 4, 1961, Christiansen resigned and was disqualified as a director; on August 22, 1961, Barcus tendered his resignation, which was accepted by the board on August 24, 1961; in the fall of 1961 the minority stockholders entered into a written agreement (already set out in full herein); on October 10, 1961, Williamson, Tobin, and Barcus requested the secretary to call a special meeting of the board on October 16, 1961, which Una, the secretary, failed to do; on October 16, 1961, Williamson, Tobin, Jenkins, Evans, and Barcus advised Una they were calling a special meeting for October 20, 1961; the minutes of that special meeting showed Barcus, Jenkins, Evans, Tobin, and Williamson were present and that Robert L. Klehr was nominated to fill the unexpired term of Norman Christiansen although the minutes did not indicate the vote; on October 19, 1961, Una had called a board

meeting which was attended by Una, by Charles C. Vaughan, president, and by R. J. Breidenthal, a director, at which meeting they attempted to elect Cynthia Vaughan, John William Mahoney, Guy Stanley, Jr., Dr. Wilson A. Reitz, Jack K. Dear, and Ira O. Orr, as directors to replace Evans, Williamson, Barcus, Tobin, and Jenkins, whom they had declared to be disqualified; on November 9, 1961, in the offices of the Guaranty Abstract Company, Evans, Jenkins, Tobin, Williamson, Barcus, and Klehr held a meeting, and in accordance with the above-mentioned agreement, a transfer of stock was made and new directors were elected from among the new stockholders in the following order:

Charles W. Hess,

Ray Hodge,

Richard M. Erickson,

Richard Griswold,

Fred E. J. Hornaman.

It was further found that on November 10, 1961, Hess wrote a letter to Una advising of the action of November 9, 1961, and therein tendered for surrender the stock certificates in question "upon reissue of new certificates;" he requested that combined certificates be issued; his letter included a list of the certificate numbers of the stock, the number of shares of each particular certificate, and to whom they were transferred; *no further tender of the stock certificates was made and the transfer was not shown on the books of the association.*

The record before us discloses that the last above finding of the trial court was correct and it is also undisputed that with his letter to Una of November 10, 1961, Hess did not submit the stock certificates in question.

The trial court also found that on November 9, 1961, Williamson, Jenkins, Tobin, and Evans tendered their resignations as directors and Barcus tendered a second resignation to Una.

The trial court's conclusions of law were that the election of October 19, 1961, attended by Una, Charles, and Breidenthal was illegal (1) for lack of notice to all qualified directors (2) no quorum of directors was present, and (3) the vacancies of Barcus and Christiansen were the only vacancies at the time because the other directors were still qualified acting directors; the position of Barcus as director had been vacated on August 24, 1961; the purported election of Klehr by the plaintiffs was illegal (1) because the meeting was not called by the secretary, as required by the bylaws, and

(2) the minutes of the meeting did not show a vote by a majority of qualified directors attending the meeting; the purported election of Hess, Hodge, Erickson, Griswold, and Hornaman on November 9, 1961, was not legal because they were *not qualified by reason of being stockholders* under provisions of G. S. 1949, 17-5407, as follows:

"Shares shall be transferable only upon the books of the association and upon proper application by the transferee and the acceptance of the transferee as a member upon terms set forth in the bylaws of the association."

The trial court then found the parties (plaintiffs) could not assert any rights as stockholders against the association until this statutory requirement had been complied with; that Barcus had participated in the November 9 purported election although he was not a qualified director; after the qualified directors attending the November 9 meeting resigned one by one there was no longer a quorum of legally-qualified directors present; Hornaman could have qualified as a director by reason of his savings deposit, but he was the last one to be elected and therefore, he was not elected by legally-constituted directors.

The trial court determined there were only three duly-constituted directors who had not resigned and that the six vacancies should be filled at the next annual meeting, which the trial court then attempted to postpone for a period of thirty days to allow time for the provision of the bylaws to be operative that the president should appoint a three member nominating committee thirty days before the annual meeting which committee, at least twenty days before the date of the annual meeting, should nominate a suitable member for each vacancy; any member could nominate a candidate fifteen days before the meeting and such names were to be posted fifteen days prior to the meeting; a nominating committee had been named at a board meeting on December 1, 1961, but the trial court was of the opinion a new nominating committee should be named and also that previously solicited proxies should be disqualified since the solicitation was directed by less than a majority of the qualified directors; a new solicitation of proxies by any qualified member of the association would be permissible upon proper transfer of stock.

The trial court ordered plaintiffs to present their assigned stock for transfer on the association's books, and the officers were directed to so transfer the stock of the parties; with the exception of Charles, Una, and Breidenthal all defendants and plaintiffs were enjoined

from attempting to assert any rights or privileges or management of the association as directors until they were properly elected and qualified as directors in compliance with the statutes and the by-laws of the association; the annual meeting was ordered post-poned for at least thirty days from the regularly provided date and the six vacancies on the board should be filled at such annual meeting as prescribed by statute and the bylaws as well as the additional vacancy due to the expiration of the term of Breidenthal; a new solicitation of proxies was provided for with which we are not presently concerned; the trial court retained jurisdiction for de-termination of whether the annual meeting and election of directors was conducted pursuant to statute and the bylaws, as well as for the promulgation of specific rules to be followed in the election of di-rectors if necessary.

No motion for new trial was filed and absent such a motion, the first point to be considered on appellate review is whether the plead-ings and the findings of the trial court sustain and support its con-clusions of law and judgment. (1 Hatcher's Kansas Digest, rev. ed., Appeal and Error, § 366, p. 166, 1962 Cum. Supp., § 366, p. 35; 2 West's Kansas Digest, Appeal & Error, § 281 [1], p. 347, 1962 Cum. P. P. 281 [1], p. 29.)

The trial court's findings were consistent with the bylaws of the association and with the appropriate provisions of the Savings and Loan Code (G. S. 1949, 17-5407, above quoted) so far as transferring shares in the association were concerned. The above section of the code requires that proper application be made for the transfer of shares on the books of the association, which proper application is set out under the Uniform Stock Transfer Act (G. S. 1949, 17-4801), as follows:

"Title to a certificate and to the shares represented thereby can be trans-ferred only, (a) by *delivery of the certificate* endorsed either in blank or to a specified person by the person appearing by the certificate to be the owner of the shares represented thereby, or (b) by delivery of the certificate with an assignment endorsed thereon or accompanied by a separate document con-taining a written assignment of the certificate. . . . [Our emphasis.]

"The provisions of this section shall be applicable although the charter or articles of incorporation or code regulations or bylaws of the corporation is-suing the certificate and the certificate itself, provide that the shares represented thereby shall be transferable only on the books of the corporation . . . ,"

and 17-5407 further requires:

". . . *the acceptance of the transferee as a member upon terms set forth in the bylaws of the association.*" (Our emphasis.)

The foregoing statutory requirements are clear but the record discloses that no certificates of stock were ever actually tendered for transfer, in compliance therewith at the association's office, and the trial court so found. We conclude that failure on the part of the purported transferees to deliver their certificates of stock to the association prevented their qualifying as stockholders in the association.

The trial court correctly found that neither group of directors was properly elected and that Charles, Una, and Breidenthal were the only qualified stockholders and directors, but by so finding the trial court also in effect found there no longer remained a plaintiff, or plaintiffs, in the case before the lower court for consideration. Thus, since the trial court had no jurisdiction over the plaintiffs or the subject matter, it had no power or authority to make any orders governing the annual election of the association members, or the future actions of the managing officers. The reasoning in support of this ruling as to the proper course to be followed by a court in such a circumstance was clearly stated in *Robertson v. The State, ex rel. Smith*, 109 Ind. 79, 83, 10 N. E. 582, 584, which was quoted with approval in *Armour v. Howe*, 62 Kan. 587, 64 Pac. 42, as follows:

" 'The only course which the court can rightfully pursue is to decline to speak in all cases where it cannot speak by the law. *It is not a matter of choice; it is a matter of duty.* The duty is as solemn and imperative as any one among all the grave duties that rest upon the courts of the country. Nor ought the courts to give opinions which are in form judgments, but in reality mere phantomatic resemblances, since, in more ways than one, such a course is productive of evil.' " (Our emphasis.) (p. 592.)

The above principle was reiterated in our later case of *McFadden v. McFadden*, 174 Kan. 533, 257 P. 2d 146, as follows:

"It is elementary that two essentials to a valid judgment are that the court have jurisdiction of the subject matter and of the persons whose rights are to be adjudicated." (p. 538.)

It should also be noted that in *Row v. Artz*, 168 Kan. 71, 211 P. 2d 66, which was originally an injunction action but was expanded to cover other matters upon which the appeal was ultimately determined, this court stated the following cardinal rules pertaining to effective judgments:

"This court under numerous and varying circumstances has, in conformity with well established principles, declined to decide issues where its judgment could not be made effective. (*Dickey Oil Co. v. Wakefield*, 153 Kan. 489, 111 P. 2d 1113, and cases therein cited.) In other words, when a judgment is merely on an abstract question of law or fact and the authority of the court cannot be vindicated by the enforcement of process a judgment is a useless

thing. Under such circumstances courts simply withhold their judgment. (See *State, ex rel., v. Smith,* 140 Kan. 461, 36 P. 2d 956.) The rule has been applied not only in cases pertaining to private controversies but in actions involving the public interest where no *actual controversy* remained and where a judgment could not amount to a judicial decision. (*Ellis v. Landis,* 118 Kan. 502, 235 Pac. 851.)" (p. 72.)

In view of the record before us and all that has been considered herein, we conclude the trial court could not enter a valid judgment and, likewise, this court cannot make a valid decision based upon such purported judgment. We are therefore compelled to reverse the judgment of the trial court with directions to dismiss the action.

Opinion filed March 2, 1963.